RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SECRETARY OF LABOR,

        *Plaintiff-Appellee*,

    *v*.

TIMBERLINE SOUTH, LLC; JIM PAYNE,

        *Defendants-Appellants*.

No. 18-1763

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:16-cv-11552—Thomas L. Ludington, District Judge.

Argued:  March 14, 2019

Decided and Filed:  April 5, 2019

Before:  SUTTON, WHITE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Jeffrey S. Theuer, LOOMIS, EWERT, PARSLEY, DAVIS & GOTTING, P.C., Lansing, Michigan, for Appellants.  Sarah J. Starrett, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.  **ON BRIEF:**  Jeffrey S. Theuer, LOOMIS, EWERT, PARSLEY, DAVIS & GOTTING, P.C., Lansing, Michigan, for Appellants.  Sarah J. Starrett, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.

_____

## OPINION

_____

HELENE N. WHITE, Circuit Judge.  Defendant Timberline South, LLC (Timberline) is a timber-harvesting company that operates solely in Michigan, but uses logging and harvesting equipment and trucks that were manufactured outside of Michigan.  The Secretary of Labor (the

Secretary) brought this action against Timberline and its director, Jim Payne, alleging violations of the overtime and recordkeeping provisions of the Fair Labor Standards Act (FLSA).

The district court granted summary judgment in favor of the Secretary, and awarded $439,437.42 in unpaid overtime and an equal amount in liquidated damages. The district court reasoned that Timberline was a covered enterprise under the FLSA because it "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," 29 U.S.C. § 203(s)(1)(A)(i), i.e., the logging and harvesting equipment manufactured outside of Michigan. Part of the damages award included time employees spent commuting from home to work or for meal periods, which the district court included in the overtime calculation after finding that Timberline had an established custom or practice of compensating its employees for such time.

Defendants appeal, arguing that the district court erred in finding liability and awarding unpaid overtime and liquidated damages. We affirm the district court's liability determination. However, because the district court erred in finding that ordinary commute time and bona fide meal periods qualify as compensable hours subject to the FLSA's overtime requirements, we vacate the award of damages and remand for further proceedings.

**I.**

Timberline was formed in 2010 as a Michigan limited liability company. Payne is an officer of Timberline and directs all of its operations. Timberline removes raw timber from forests, cuts the timber, and transports the timber to mills for processing into paper and other products. Timberline maintains two to four worksites, each with approximately four equipment operators who cut down trees, cut the timber into lengths, and transport the timber to a landing site. Timberline also employs six to eight truck drivers, who load the timber at the landing site and transport it to the mills, as well as mechanics and an office manager. Timberline's equipment operators use heavy, specialized machinery, including harvesters and hydro-axes to cut down trees and cut the trees into lengths, and forwarders and skidders to transport the timber to the landing site or to load trucks. All of Timberline's business activities occur in Michigan: it harvests timber in Michigan; it transports timber to mills located only in Michigan; it entered

into contracts for cutting timber in Michigan; and it purchased its trucks and heavy equipment from Michigan sellers. Although purchased and used only in Michigan, Timberline's trucks and heavy equipment were manufactured outside of Michigan.

Payne established Timberline's compensation and recordkeeping practices. Timberline paid its employees using a daily rate, an hourly rate, or a cord[1] rate. Timberline recorded hours worked for hourly employees but did not do so for most non-hourly employees, and did not pay its employees an overtime rate for hours worked over 40 in a week.

Timberline was founded after a previous company, Timberline Logging, Inc. (Timberline Logging), went out of business. In February 2011, Payne instructed his office manager to email Matthew Rooyakker, Timberline Logging's accountant, regarding whether Timberline Logging was exempt from paying overtime "under FLSA in Tennessee." (R. 18-12, PID 1674.)[2] Payne also testified that he discussed FLSA coverage with his accountant on "a couple different occasions" "awhile back," "before the investigation" that led to this lawsuit. (R. 19-12, PID 2273.) According to Payne, Rooyakker told him that "we were exempt under agriculture" (*id.* at PID 2274), although Rooyakker had not held himself out as knowledgeable about the FLSA, and Payne did not believe that his truck drivers or office workers were agricultural employees. Payne did not consult with an attorney.

Defendants took the position in this lawsuit that the Motor Carrier Act exemption, 29 U.S.C. § 213(b)(1), exempts some of Timberline's employees from FLSA coverage. In response to the Secretary's interrogatories about this exemption, Defendants stated that they relied upon the "FLSA and publications prepared by Plaintiff" in determining that that the Motor Carrier Act exemption applied, but Payne did not recall which publications he relied on and was not able to explain why his drivers and their helpers were exempt if the drivers only drove intrastate routes. (R. 18-4, PID 271-81.)

Rooyakker testified that the only time he provided advice regarding the FLSA was at a meeting with Payne on February 17, 2011. At that meeting, in response to Timberline Logging's

---

[1]A cord is a standard measurement of wood.

[2]Timberline Logging performed work in Tennessee, but Timberline did not.

inquiry, Rooyakker told Payne that it appeared that "you're exempt" under the agricultural exemption.  (R. 18-13, PID 1702.)  Rooyakker testified that he did not advise which of Timberline Logging's or Timberline's employees were subject to the FLSA's agricultural exemption and never opined whether either entity's employees in Michigan may also be exempt.

Wage and Hour Investigator Jeffrey Wrona of the Department of Labor (DOL) investigated Timberline for wage and recordkeeping violations for the time period of August 25, 2013 through August 20, 2015, later extended through March 20, 2017.  After assessing unpaid overtime wages, the Secretary of Labor filed a complaint alleging that Defendants had violated the overtime and recordkeeping provisions of the FLSA, and sought an injunction, back wages, and liquidated damages.

The district court granted the Secretary's motion for summary judgment in part and denied Defendants' cross-motion for summary judgment, granted the Secretary's motion to amend the complaint to include additional employees and FLSA violations that had occurred during 2016 and 2017, awarded liquidated damages, and ordered further briefing by the parties on the amount of backpay.

After two rounds of supplemental briefing, the district court issued a final summary judgment decision awarding $439,437.42 in backpay damages and an equal amount in liquidated damages.  This appeal followed.

## II.

This court reviews de novo a grant of summary judgment, viewing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party.  *Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 345 (6th Cir. 2018).[3]  Summary judgment is

---

[3]The Secretary argues that we should review the district court's decision to award liquidated damages for an abuse of discretion, but in making that argument the Secretary relies on cases involving liquidated damages awarded after a trial.  Here, the district court decided the issue on summary judgment and found that it had no discretion as a matter of law to decline to award or reduce the amount of liquidated damages.  Hence, our review is de novo. *See Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) ("Although we generally review a district court's decision on liquidated damages for abuse of discretion, we review the issue here, which was decided below on summary judgment, *de novo*." (internal citation omitted)).

appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. Enterprise Coverage and the Handling Clause

The FLSA requires, among other things, that a qualifying enterprise pay certain employees overtime pay at one and one-half times their regular rate for each hour above 40 worked in a workweek. 29 U.S.C. § 207(a). At issue in this appeal is whether Timberline is "an enterprise engaged in commerce or in the production of goods for commerce," defined as

> an enterprise that--
>
> **(A)(i)** has employees engaged in commerce[4] or in the production of goods[5] for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> **(ii)** is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);

29 U.S.C. § 203(s)(1)(A).

There is no dispute that Timberline is an "enterprise" under § 203(r)(1),[6] qualifies as an "employer" under § 203(d),[7] and had an annual gross volume of sales in excess of $500,000 for each relevant year, § 203(s)(1)(A)(ii). Nor did the Secretary argue that Timberline was a covered enterprise because it had "employees engaged in commerce or in the production of

---

[4]"'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

[5]"'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." 29 U.S.C. § 203(i).

[6]"'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor. . . ." 29 U.S.C. § 203(r)(1).

[7]"'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d).

goods for commerce." § 203(s)(1)(A)(i). Rather, the parties disagree about whether Timberline "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," *id.*, often referred to as the "handling clause."

As originally enacted, the FLSA covered certain employees but did not encompass enterprise-wide coverage. That concept was added in 1961. *See* Pub. L. No. 87-30, § 2, 75 Stat. 65, 65-66 (1961). "After the [1961] amendment, if an employer had two or more workers engaged in commerce or the production of goods for commerce, FLSA coverage extended to all of the enterprise's employees." *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1220 (11th Cir. 2010) (citing *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498, 500-01 (5th Cir. 1975)). Included in the 1961 amendment was the addition of the handling clause. In 1974, Congress clarified that the handling clause was an independent basis for enterprise coverage[8] and added "or materials" to that clause. *See id.* at 1220-21. "Materials" is not defined in the statute. "Goods" is, however, and contains what is often called the "ultimate-consumer exception," excluding from the definition "goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." 29 U.S.C. § 203(i). The district court held that Timberline is a covered enterprise under the handling clause because Timberline's employees' use of logging and harvesting equipment manufactured outside of Michigan constitutes "handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." § 203(s)(1)(A)(i).

Defendants argue that Timberline is not a covered enterprise because the only thing Timberline's employees "handle" is timber, which never crosses state lines; and that even if they "handled" the logging and harvesting equipment, that equipment does not qualify as "materials," but rather qualifies as "goods," and that Timberline is the ultimate consumer of those goods such that the FLSA does not apply. (Appellants' Br. at 11-14, 16-18.) Further, Defendants argue that

---

[8]Between the 1961 and 1974 amendments, coverage extended to enterprises with "employees engaged in commerce or in the production of goods for commerce, *including* employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce." 29 U.S.C. § 203(s) (1970) (emphasis added). The 1974 amendment replaced "including" with "or."

finding enterprise coverage in this case "would effectively erase the commerce requirement necessary for FLSA jurisdiction" because "[e]very business uses computers made overseas, or pencils and pens made out of state, or copiers, paper, or telephones made in other jurisdictions." (Appellants' Br. at 14.)

We begin our analysis of the "handling clause" with the language of the statute. *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007). "If the language of the statute is clear, then the inquiry is complete, and the court should look no further. Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning." *Id.* (citations omitted).

The plain language of the statute contradicts Defendants' arguments that Timberline is not a covered enterprise because "[t]he only good or material that Timberline handles, sells, or otherwise works on within the meaning of the FLSA, is the timber itself," and because Timberline's employees "did not place th[e logging and harvesting] equipment in commerce themselves." (Appellants' Br. at 12.) We find no merit to these arguments because it is not relevant under the statute that Timberline employees did not place the logging and harvesting equipment in commerce themselves; the plain language of the statute provides coverage where employees handle, sell, or otherwise work on "goods or materials that *have been moved in or produced for commerce by any person*." 29 U.S.C. § 203(s)(1)(A)(i) (emphasis added). "The tense is in the past. There is no requirement of continuity in the present." *Polycarpe*, 616 F.3d at 1221 (quoting *Brennan v. Greene's Propane Gas Serv., Inc.*, 479 F.2d 1027, 1030 (5th Cir. 1973)). Further, the statute makes clear that it applies when *any person*—not just the employees of the enterprise—has moved or produced the handled goods or materials in commerce. Because the logging and harvesting equipment had previously been moved in and produced for commerce by others prior to being handled by Timberline employees, this part of the statute is satisfied.

Less clear is whether the logging and harvesting equipment constitute "goods" or "materials" and whether Timberline is the ultimate consumer of the logging and harvesting equipment such that if the logging and harvesting equipment qualify as goods and not materials, the ultimate-consumer exception operates to exclude Timberline from coverage. "[P]recisely determining the correct ordinary meaning of 'materials' for the FLSA is challenging because the

FLSA's statutory definition of 'goods' is so expansive, ostensibly including some items that could also fall under the ordinary meaning of 'materials.'" *Id.* at 1223. Thus, we may look to other sources to determine the meaning, including "interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed." *Brilliance Audio*, 474 F.3d at 371-72.

As an initial matter, we have previously explained that the FLSA "was enacted by Congress to be a broadly remedial and humanitarian statute. The Act was designed to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . .'" *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (alteration in original) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977)). "[T]he FLSA, as a statute designed to protect individual rights, . . . 'must not be interpreted or applied in a narrow, grudging manner.'" *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 585 (6th Cir. 2002) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

Several of our sister circuits have addressed similar situations and have suggested that the addition of "or materials" to the handling clause essentially rendered the ultimate-consumer exception obsolete. In *Brock v. Hamad*, the Fourth Circuit held that the defendant's rental operation was a covered enterprise where the defendant stipulated that he "had bought goods that had been moved in interstate commerce and that these goods had been used in the course of his employees' employment." 867 F.2d 804, 807-08 (4th Cir. 1989). Rejecting the defendant's argument that the rental operation was the ultimate consumer of these goods so that coverage did not extend to it, the Fourth Circuit explained: "Hamad's argument, however, erroneously isolates Section 203(i)['s definition of 'goods'] from the remainder of the FLSA. When Section 203(i) is read in context with Section 203(s), which covers 'employees handling, selling, or otherwise working on goods or materials,' it seems that defendant's argument must fail." *Id.* at 807; *see also id.* at 808 ("[I]t is well established that local business activities fall within the FLSA when an enterprise employs workers who handle goods or materials that have moved or have been produced in interstate commerce."); *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 695 (4th Cir. 1990) ("Appellants' contention that the Home was in some sense the 'ultimate

consumer' of the goods and materials that moved in interstate commerce does not preclude application of the Act."  (citing *Hamad*, 867 F.2d at 807-08)).

Similarly, the Third Circuit held that a company "engaged in the business of collecting garbage, trash, and scrap metal" was a covered enterprise.  *Marshall v. Brunner*, 668 F.2d 748, 750 (3d Cir. 1982).  The defendant argued that its use of "motor vehicles, gas, oil, and other manufactured goods" did not result in FLSA coverage because it was the ultimate consumer of those goods.  *Id.* at 751.  The Third Circuit rejected that argument, relying heavily on the legislative history in concluding that the company was a covered enterprise.  *Id.* at 751-52 (citing S. Rep. No. 93–690, at 17 (1974), which explains that the amendment "adds the words 'or materials' after the word 'goods' to make clear the Congressional intent to include within this additional basis of coverage the handling of goods consumed in the employer's business, as, e.g., the soap used by a laundry").

The Tenth Circuit reached the same conclusion regarding a real-estate developer whose employees used construction machinery for "removing and thinning trees, clearing brush, grading and contouring the land for streets and drainage, installing culverts, pouring concrete for curbs and laying asphalt."  *Donovan v. Pointon*, 717 F.2d 1320, 1322 (10th Cir. 1983).  Although the defendant had acquired the machinery from within the same state in which the equipment was used, the Tenth Circuit explained that fact was

> irrelevant to a determination of whether [the defendant] is a covered employer. The critical issue is whether the goods or materials handled by [the defendant] and his employees had moved in interstate commerce, and, in this regard, it is undisputed that they did. "Using" goods or materials which have moved in interstate commerce constitutes a "handling" within the meaning of 29 U.S.C. § 203(s).

*Id.* at 1322-23 (internal citations omitted); *see also Donovan v. Scoles*, 652 F.2d 16, 18-19 (9th Cir. 1981) (gas station engaged in purely intrastate activities is a covered enterprise because the FLSA "imposes no requirement that the goods have a present involvement in interstate commerce when they are handled or sold.  Instead it broadens coverage to include all employees within the stream of commerce of such goods, even if their own participation remains purely intrastate."); *Brennan v. Iowa*, 494 F.2d 100, 101, 103 n.5, 104 (8th Cir. 1974) (holding that

hospitals and schools were subject to the FLSA because "many employees handle articles which have moved in interstate commerce," including drugs, cleaning supplies, food, and laundry supplies); *Indus. Am. Corp.*, 516 F.2d at 501-02, 502 n.8 (explaining that the 1974 "amendment leaves the definition of goods intact but circumvents it by a broader definition of 'enterprise engaged in commerce,'" which had the effect of expanding the FLSA "to every enterprise in the nation doing" the requisite volume of business); *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 530 (S.D.N.Y. 1998) (Sotomayor, J.) (explaining that the 1974 amendments to the FLSA resulted in "virtually every enterprise" doing the requisite volume of business being covered by the FLSA, and holding that sanitations crews' use of "bags, brooms, shovels, pails, scrapers . . . radios, books . . . [and] flashlights" that had moved in interstate commerce resulted in FLSA enterprise coverage (alterations in original) (citations omitted)).

In recent years, the Eleventh Circuit addressed this issue at length, extracting a definition of "materials" from the FLSA by considering the plain language of the statute, legislative history, and the DOL's interpretation. *Polycarpe*, 616 F.3d at 1221-27. In its view, courts could not properly assume that Congress intended to overrule the ultimate-consumer exception contained in the definition of "goods" with the addition of "materials" to the statute. Doing so, it said, would violate a basic principle of statutory interpretation by not giving effect to all the words in the statute. *Id.* at 1222-23.

The court thus considered two ordinary definitions of "materials" potentially applicable in the FLSA context and adopted one for purposes of the handling clause:

> One definition views "materials" as the "apparatus (as tools or other articles) necessary for doing or making something." A second definition defines "materials" as "the basic matter (as metal, wood, plastic, fiber) from which the whole or the greater part of something physical (as a machine, tool, building, fabric) is made." Looking only to the word's ordinary meaning, it seems that "materials" as used in the FLSA could potentially include items used in performing actions or services (*e.g.* describing pen and paper as "writing materials"), items that serve as a component of something else, or both.

> But precisely determining the correct ordinary meaning of "materials" for the FLSA is challenging because the FLSA's statutory definition of "goods" is so expansive, ostensibly including some items that could also fall under the ordinary meaning of "materials." Much of the FLSA's definition of "goods" is comprised, it seems, of synonyms for items sold by a business: "goods . . . , wares, products,

commodities, merchandise, or articles . . . ." But Congress's expressed definition for "goods" also includes "or any part or ingredient thereof." The plain text of this last phrase indicates to us that, of the two ordinary meanings that we identified for "materials," the second one—the one involving constituent parts—overlaps with part of the statutory definition of "goods."

We must interpret the FLSA in a way that Congress's 1974 addition of the words "or materials" does not impliedly repeal the unchanged "goods" definition or that definition's ultimate-consumer exception. Therefore, we believe that the most accurate view of Congress's intent for the interplay between "goods" and "materials" in the FLSA—one that does not impliedly repeal some of the statutory definition of "goods"—is to read "materials" in the FLSA this way: "materials" in the FLSA means tools or other articles necessary for doing or making something. We believe that this interpretation is true to the ordinary meaning of "materials" and avoids conflict with the statutory "goods" definition.

*Id.* at 1223-24 (alterations in original) (internal citations and footnote omitted). The court also explained that to be considered "materials," an item "must have a significant connection with the employer's commercial activity; the business may not just somehow internally and incidentally consume the item." *Id.* at 1226. "This requirement," the court reasoned, "is compelled because the statute covers not *all* 'goods' and 'materials,' but only 'goods' and 'materials' that a company is engaged in 'handling, selling, or otherwise working on.'" *Id.* (quoting 29 U.S.C. § 203(s)(1)(A)(i)).

*Polycarpe* cautioned that the same items could be goods in one case, materials in another, and neither goods nor materials in still another case, depending on the use of the item in the context of each case. "Where a catering business uses the china plates at a client's banquet, the plates count as part of the 'materials' necessary for serving a catered meal. But, where a department store sells the same china plates as stand-alone items, the plates count as 'goods' for that retailer." *Id.* Those same plates hung as decorations on the lobby wall of an accounting firm, however, constitute neither goods nor materials "because the plates have no significant connection to the business's accounting work." *Id.*

We find the reasoning of *Polycarpe* persuasive because it gives effect to "materials" without totally overlapping with the statutory definition of "goods" and thus displacing the ultimate-consumer exception contained within that definition. *See Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001) ("Every word in the statute is presumed to have meaning, and we must give

effect all the words to avoid an interpretation which would render words superfluous or redundant." (citations omitted)); *see also Rodriguez v. United States*, 480 U.S. 522, 524 (1987) ("[R]epeals by implication are not favored and will not be found unless an intent to repeal is clear and manifest." (internal quotation marks and citations omitted)).

Applying the definition of "materials" from *Polycarpe*, the logging and harvesting equipment used by Timberline's employees plainly constitute "materials" because the equipment is necessary to cut down trees and transport the timber, which in turn have a significant connection to Timberline's commercial activities of harvesting and selling timber.

Defendants disagree with *Polycarpe*'s analysis, arguing that it erroneously "relied upon a simple alternate definition" of "materials" rather than other definitions that would be "more consistent with the language of the FLSA," such as "constituent parts of a whole, or elements of something else," or the "material components that make up" "the thing being produced by the enterprise." (Reply at 1, 3-4.) However, Defendants' proffered definition of "materials" has not been adopted by other circuits; and because "goods" includes in its definition "any part or ingredient [of goods]," 29 U.S.C. § 203(i), Defendants' definition would render both terms redundant.

Defendants also argue that *Polycarpe*'s definition of "materials" is limited to items provided by an employer to its customers or "incorporated into products as part of the defendant employer's services, such as paint used by a construction company, shutter blades for a window shutter manufacturer, [or] burglar alarms installed by a security company." (Appellants' Br. at 13.) Defendants read *Polycarpe* too narrowly. *Polycarpe* remanded all but one of the cases[9] to the district court to determine whether the items at issue were moved in or produced for interstate commerce and, if so, whether those items constitute "goods" or "materials." 616 F.3d at 1229. Some of the items at issue in *Polycarpe* are analogous to the logging and harvesting equipment in this case, such as lawnmowers, edgers, and trucks used by a landscaping company. *Id.* at 1228. On remand, the district court held that the landscaping company was a covered enterprise

---

[9]*Polycarpe* affirmed one judgment in one case in favor of the defendants because the evidence at trial did not establish that the business met the volume requirement of 29 U.S.C. § 203(s)(1)(A)(ii). 616 F.3d at 1229.

because the trucks it used were "materials" rather than "goods." *Polycarpe v. E & S Landscaping Serv., Inc.*, 821 F. Supp. 2d 1302, 1307 (S.D. Fla. 2011).

Finally, under these facts, we need not extensively address Defendants' argument that finding FLSA coverage in this case would "effectively erase the commerce requirement necessary for FLSA jurisdiction" because "[e]very business uses computers made overseas, or pencils and pens made out of state." (Appellants' Br. at 14.) As an initial matter, the parties point to no case where the DOL has attempted to enforce the statute in this manner. Further, the court in *Polycarpe* was apparently concerned with expanding coverage in this way and offered reasonable bases to reject any attempt to do so. First, the court noted that the terms, "handling, selling, or otherwise working on" "denote a connection to the employer's . . . commercial activity," such that mere internal and incidental consumption of an item would not suffice to qualify. 616 F.3d at 1226. Second, it explained that DOL regulations instruct that employees must handle or work on the goods or materials "regularly and recurrently" for enterprise coverage to attach. *Id.* at 1226 n.7 (quoting 29 C.F.R. § 779.238). Regardless, coverage here is not premised on employees' incidental use of office items; rather, it is premised on employees' regular and recurrent use of logging and harvesting equipment that is used to carry out the company's commercial activity of harvesting timber.

Accordingly, the district court correctly found that Timberline is a covered enterprise under the FLSA's handling clause.

**B. Motor Carrier Act Exemption**

Next, Defendants challenge the district court's determination that Timberline's truck drivers and their helpers are not exempt from the FLSA's overtime provisions pursuant to 29 U.S.C. § 213(b)(1), which exempts from coverage "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." The Motor Carrier Act (MCA) provides that the "Secretary of Transportation may prescribe requirements for" "(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier"; and "(2) qualifications and maximum hours of service of employees of, and standards of

equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b). "Motor carrier" is defined as a "person who provides motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Defendants do not contend that Timberline is a motor carrier. Rather, Defendants argue that Timberline is a "motor private carrier," defined as a person who transports property or goods in interstate commerce. 49 U.S.C. § 13102(15). Consistent with these statutory definitions, this court has previously explained that "[t]he MCA . . . gives the Secretary of Transportation 'the authority to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the safety of operation of that motor carrier.'" *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002) (quoting *Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1106-07 (4th Cir. 1997)).

Exemptions from the FLSA's overtime provisions requirements are narrowly construed against the employer, and the employer bears the burden of proving that it qualifies for a claimed exemption. *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004); *see also Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 790-91 (3d Cir. 2016) (explaining that the MCA exemption is narrowly construed against the employer); *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154 (10th Cir. 2016) (same); *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1212 (11th Cir. 2011) (same).

Defendants argue that some of Timberline's employees are exempt from coverage because Timberline's trucks are operated under U.S. Department of Transportation (DOT) registration numbers and its drivers maintain commercial driver's licenses, which they say are sufficient bases to find that the MCA exemption applies. In support of this argument, Defendants cite *Finn v. Dean Transportation, Inc.*, 53 F. Supp. 3d 1043 (M.D. Tenn. 2014). In *Finn*, the district court held that a company was a motor private carrier where its drivers transported ten percent of its goods in interstate commerce. *Id.* at 1056-57. In response to the employee's argument that the MCA exemption should not apply because the DOT had never exercised its authority to audit the company or to conduct roadside stops, the district court stated that "Finn's concession that the DOT had 'some regulatory authority' over his work as a driver is, standing alone, dispositive of this issue." *Id.* at 1057. The district court then noted that the

driver "admits that he was required to hold a CDL, that DTI has a DOT registration number, that DTI was subject to DOT audit, that its vehicles could be stopped for inspection at any time, and that DTI drivers were required to undergo a yearly physical (for which DTI paid)." *Id.* at 1057-58.

Defendants read too much into *Finn*. Finn was exempt because his employer met the definition of a motor private carrier and was therefore subject to DOT regulation. *Id.* at 1055-56. We have previously rejected an argument that the mere issuance of a certificate by the Interstate Commerce Commission (which regulated motor carriers prior to the DOT) was sufficient to bring employees within the MCA exemption when those employees drove only intrastate routes. *See Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 413 (6th Cir. 1970); *see also Mazzarella*, 823 F.3d at 792 ("The DOT certificate merely authorizes Defendants to engage in interstate transportation. It provides no information about whether Defendants' drivers actually drove across state lines or otherwise engaged in interstate commerce.").

The dispositive inquiry here is not whether Timberline's employees held commercial driver's licenses or whether its trucks had DOT registration numbers; rather, the dispositive inquiry is whether Timberline's drivers transport goods in interstate commerce, thus rendering Timberline a motor private carrier. 49 U.S.C. § 13102(15); *Vaughn*, 291 F.3d at 904. Courts have consistently interpreted this to mean that drivers must travel or transport the goods across state lines, or transport the goods in a "'practical continuity of movement' across State lines from the point of origin to the point of departure." 29 C.F.R. 782.7(b)(1) (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)); *see also Baird*, 425 F.2d at 413; *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 234 (7th Cir. 1961). Here, it is undisputed that Timberline's truck drivers did not cross state lines.

Defendants nevertheless argue that Timberline's drivers transport goods in "a practical continuity of movement" in interstate commerce because its timber "is an ingredient in the goods manufactured by the mills to which it is delivered." (Appellants' Br. at 22.) Defendants, however, presented no evidence that their timber was eventually shipped in interstate commerce by the mills. To the contrary, Payne's affidavit stated that Timberline has "no control over what is done with the timber delivered to the mills, nor do we know the eventual destination or use of

that timber." (R. 19-3, PID 2080.) Further, even if the timber was used by the mills to make other products, such as paper, and then shipped across state lines, the fact that the timber was altered before crossing state lines weighs against finding the MCA exemption applicable. *See Mazzarella*, 823 F.3d at 791-93 (citing *Collins v. Heritage Wine Cellars, Ltd.,* 589 F.3d 895, 897 (7th Cir. 2009)) (in considering whether drivers who transported water to hydraulic fracking sites within Pennsylvania were subject to MCA exemption, "whether the water is altered during the fracking process" would be relevant in determining whether there was a practical continuity of movement in interstate commerce; MCA exemption did not apply because the defendant produced no evidence concerning this or other relevant matters).

Absent any evidence that Timberline's drivers crossed state lines or transported goods as part of a practical continuity of movement in interstate commerce, the district court correctly found that none of Timberline's employees was exempt from the FLSA's overtime requirements under the MCA exemption.

### C. Damages

#### 1. Briefing Before the District Court

Three rounds of briefing occurred before the district court granted summary judgment on damages. In the Secretary's original summary judgment brief, Investigator Wrona estimated that Timberline owed unpaid overtime of $468,595.80 for 50 employees. Wrona explained that he primarily relied on Timberline's payroll records to calculate unpaid overtime. However, because Timberline lacked hours-worked records for some employees, Wrona had to use other methods to reconstruct the hours those employees worked. Defendants argued in part that in extrapolating hours worked from the employees' pay records, the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a), required a reduction in the number of hours for the time employees spent on meals and in traveling to and from their homes to their workplaces—hours for which the employees were paid, but which do not count as work. After the original summary judgment briefing, the district court rejected Defendants' argument that the Portal-to-Portal Act required such a reduction, finding that Defendants had an established custom or practice of compensating for such time.

The district court also ordered supplemental briefing to clarify inconsistencies in the record and to provide requested information in a specific format.

In the Secretary's first supplemental brief, he calculated revised unpaid overtime to be $454,684.73 for the 50 employees. The Secretary explained that 43 out of the 50 employees were paid an hourly rate for their entire employment, and because Defendants kept records of their hours worked, "[c]omputing overtime for these employees is a simple case of arithmetic based upon Defendants' own records." (R. 38, PID 3725-26.) The Secretary explained that he computed back wages for the remaining seven employees without complete hours-worked records by: "(1) averaging the number of hours similarly situated employees worked per week or (2) averaging the number of hours individual employees worked each workweek based upon time records previously kept for each employee prior to Defendants changing the employee compensation to non-hourly and ceas[ing] keeping the required records." (*Id.* at PID 3726.) The Secretary also presented voluminous data showing how he arrived at the calculated unpaid overtime. Defendants argued in response that the calculations performed by the Secretary for the non-hourly employees lacked credibility because the calculations guessed at hours worked and pay rate, contained errors, and led to absurd results because Defendants presented evidence that their employees were paid significantly more than the industry average.

The district court noted certain discrepancies that required additional briefing but also rejected many of Defendants' arguments that the data was inflated and that industry-aggregate data should be used instead. It reasoned that "Defendants simply reassert their overarching argument that their compensation scheme resulted in compensation that far exceeded industry averages and, therefore, that they should be excused from their obligations under the FLSA overtime provisions. They cite no authority for this proposition." (R. 43, PID 4187.) The district court also noted that Defendants were critiquing the Secretary's "methodology largely by cherry picking particular workweeks with unusually high gross wages or unusually low gross wages" and were essentially attacking "the statistical concept of an average." (*Id.* at PID 4188.)

In the Secretary's second supplemental brief regarding damages, the Secretary addressed the district court's identified concerns and recalculated unpaid overtime to $445,533.49, which reflected a change of unpaid overtime for three non-hourly employees and one hourly employee.

Defendants responded by arguing that the Secretary's third attempt still contained errors, which they said evidenced a total lack of credibility in the Secretary's calculations, and thus the district court should award no damages or use the industry-aggregate data to determine unpaid overtime. They also reasserted their argument that the award should be reduced due to compensation for commute and meal time.

The district court made reductions to the Secretary's claimed unpaid overtime to address errors identified by Defendants, but otherwise rejected Defendants' arguments. The district court awarded damages for unpaid overtime of $439,437.42, and an equal amount in liquidated damages.

### 2. Arguments on Appeal

On appeal, Defendants appear to make two legal arguments. First, Defendants argue that the district court erred in not applying the Portal-to-Portal Act to reduce overtime owed by the time the employees spent during meals and traveling to and from work. Second, Defendants argue that because each of the Secretary's calculations of overtime contained errors and inconsistences, the Secretary failed to meet his burden to prove damages, and the district court should have entered an award of no damages or ordered that industry-aggregate data be used to arrive at a just and reasonable damages amount.

### 3. Analysis

The Portal-to-Portal Act, 29 U.S.C. § 254, provides in part:

**(a) Activities not compensable**
Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . .

> **(1)** walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> **(2)** activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. . . .

**(b) Compensability by contract or custom**

Notwithstanding the provisions of subsection (a) which relieve an employer from liability and punishment with respect to any activity, the employer shall not be so relieved if such activity is compensable by . . .

. . . .

> **(2)** a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

**(c) Restriction on activities compensable under contract or custom**

For the purposes of subsection (b), an activity shall be considered as compensable under such contract provision or such custom or practice only when it is engaged in during the portion of the day with respect to which it is so made compensable.

**(d) Determination of time employed with respect to activities**

In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act of 1938, as amended, of the Walsh-Healey Act, or of the Bacon-Davis Act, in determining the time for which an employer employs an employee with respect to walking, riding, traveling, or other preliminary or postliminary activities described in subsection (a) of this section, there shall be counted all that time, but only that time, during which the employee engages in any such activity which is compensable within the meaning of subsections (b) and (c) of this section.

The district court held after the initial summary judgment briefing that Defendants had a custom or practice of paying for non-compensable time such as travel and meal time and reasoned that this time must be included in determining hours worked and overtime owed pursuant to the Portal-to-Portal Act. After the initial summary judgment briefing, Defendants submitted affidavits from five employees, which they argued showed "some, but not necessarily all, employees who did not agree or understand that these hours would be included as hours worked or for overtime." (R. 41, PID 4115.) These affidavits stated that the employee "was paid for driving to and from the worksite, but [he] did not have an agreement or understanding that this time would be included in any calculation of overtime." (*See, e.g.*, R. 41-12, PID

4167.)**10**  The affidavits also stated that the employee "took a half-hour lunch when [he] could fit it in" and that the employee included "drive time and lunch time in total hours."  (*Id.*)

Although the plain language of the Portal-to-Portal Act suggests that home-to-work commutes are deemed compensable if the employer has a custom or practice of compensating for such work, 29 C.F.R. § 785.34 explains that "ordinary travel from home to work (see § 785.35) need not be counted as hours worked even if the employer agrees to pay for it."  And, 29 C.F.R. § 785.35 says plainly that "[n]ormal travel from home to work is not worktime."  The reason is that the FLSA only requires overtime compensation for "actual work or employment," *Tenn. Coal, Iron & R. Co.*, 321 U.S. at 597, "[a]nd even where there is a contract, custom, or practice to pay for time spent in such a 'preliminary' or 'postliminary' activity, section 4(d) of the Portal Act does not make such time hours worked under the Fair Labor Standards Act, if it would not be so counted under the latter Act alone," 29 C.F.R. § 790.7; *see also id.* § 790.5 ("But where, apart from the Portal Act, time spent in such an activity would not be time worked within the meaning of the Fair Labor Standards Act, although made compensable by contract, custom, or practice, such compensability will not make it time worked under section 4(d) of the Portal Act.")**11**  "The general rule . . . is and always has been that the FLSA does not treat ordinary home-to-job-site travel as compensable."  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 360 (2d Cir. 2011).  The same is true of "bona fide meal periods."  29 C.F.R. § 785.19; *see also Ruffin v. MotorCity Casino*, 775 F.3d 807, 811-15 (6th Cir. 2015) (examining whether meal periods were compensable under the FLSA as "work").

Although it does not appear that any other circuit court has addressed this issue, district courts have held that ordinary home-to-work and work-to-home commute time does not qualify as "work" under the FLSA even if the employer has paid for such time, and therefore that time is not subject to overtime requirements.  *See Pietrzycki v. Heights Tower Serv., Inc.*, 290 F. Supp.

---

**10**Other employees submitted declarations indicating that their timecards did not include commute time and that they usually did not take a bona fide meal break.

**11**A different regulation suggests that where there is an agreement between the parties to treat non-compensable time, such as bona fide meal time, as "work" that is subject to the overtime requirements of the FLSA, that time would be included as "work" in the calculation of unpaid overtime.  *See* 29 C.F.R. § 778.320.  However, the district court did not rely on any agreement between the parties, and neither party briefs this issue on appeal.  Rather, the district court focused only on whether Defendants had a custom or practice *of paying for commute and lunch time*, not whether there was an agreement to treat the time as hours worked under the FLSA.

3d 822, 835 (N.D. Ill. 2017) ("In other words, a custom, practice, or contract of paying for ordinary home-to-work commuting cannot make that travel time into hours worked if it would not have been characterized as such before Congress passed the PPA."); *Shearer v. Edger Assocs. Inc.*, No. 8:14-CV-2689-T-27JSS, 2015 WL 9274928, at *4 (M.D. Fla. Dec. 18, 2015) ("As discussed, Defendants' policy to compensate Shearer for her commute time from home to the first work site and from the last work site home does not make those hours 'worked' for purposes of the FLSA."); *Gilmer v. Alameda-Contra Costa Transit Dist.*, No. C 08-05186 CW, 2010 WL 289299, at *5 (N.D. Cal. Jan. 15, 2010) ("Thus, the exceptions to the Portal Act do not render compensable time that would not otherwise have been compensable under the FLSA. . . . Accordingly, Plaintiffs' start-end travel time, even if they were paid for it, would not be included in computing their hours worked for overtime purposes if it were considered travel from work to home."); *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 707 (E.D. Tex. 2007) ("A review of the applicable regulations and case law on this issue leads the court to conclude that, because the travel at issue in this case was ordinary home-to-work travel, such travel did not qualify as hours worked, even if RGIS had a custom or practice of paying for it.").

The regulations and district court cases applying them are persuasive and a reasonable interpretation of the statutes. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[R]ulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."). Accordingly, we adopt their interpretation.

Here, the district court determined that ordinary commute time and meal time that was included in Defendants' records qualified as compensable hours under the FLSA and, therefore, the court did not determine, and the Secretary did not calculate, the amount of ordinary commute time and bona fide meal time included in the records used to calculate unpaid overtime. This was error. Any ordinary commute and bona fide meal time that can be established must not be included in determining how many hours of overtime each employee worked, although

Defendants may not use the amounts paid for those otherwise non-compensable work periods as an offset against the amounts owed. *See Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 913 (9th Cir. 2004); *Reich v. Lucas Enterprises, Inc.*, 2 F.3d 1151 (6th Cir. 1993). Accordingly, we vacate the grant of summary judgment on damages and remand for further proceedings.**[12]**

Given our disposition of this issue, we need not address Defendants' remaining arguments on damages. However, in the interest of judicial economy, we note that the district court was correct in rejecting Defendants' argument that "industry aggregate data" should be used to determine unpaid overtime rather than Defendants' payroll records. Defendants' proposed calculation method focuses not on the employees' actual rate, *see* 29 U.S.C. § 207 (requiring employers to pay an employee "not less than one and one-half times the regular rate at which *he* is employed" for hours worked over 40 in a workweek (emphasis added)), but rather the rate at which other employees at different companies with potentially vastly different job duties and experience are paid. Because there is no support for applying this methodology, the district court correctly rejected this argument at the summary-judgment stage. *See Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1065 (6th Cir. 2019) ("The reasonableness of the DOL's proposed calculation depends in part on the availability of other, more reasonable alternatives to that proposal. . . . Although the calculation adopted by the district court may be imprecise, it is the best method available in light of ODPS's failure to maintain accurate and complete records.").

### D. Liquidated Damages

The FLSA provides that "[a]ny employer who violates [the FLSA's minimum wage or overtime provisions] shall be liable to the employee or employees affected" in the amount of the unpaid overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Despite the mandatory wording of that section, Congress has authorized

---

**[12]**The Secretary argued to the district court that even if Defendants' employees' travel time and lunch breaks were included in the recorded hours, Defendants did not meet their burden to negate the reasonableness of the Secretary's damages computations, that there was an agreement to treat these hours as hours worked, and that Defendants did not establish that the travel time did not constitute work time or that their employees received bona fide meal breaks. The district court did not address any of these arguments, and the Secretary does not argue these alternative bases for affirmance on appeal. Accordingly, we leave these issues to the district court.

district courts to reduce or decline to award liquidated damages under the FLSA "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation of the" FLSA. 29 U.S.C. § 260. "This burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.'" *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (alterations in original) (quoting *McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971)).

"To prove that it acted in good faith, an employer 'must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions.'" *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584–85 (6th Cir. 2004) (alteration in original) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d. Cir. 1991)). Establishing that the employer did not willfully misclassify an employee is insufficient to show good faith. *Id.* (citing *Elwell*, 276 F.3d at 841 n.5). Rather, "[t]he employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." *Id.* (citing *Elwell*, 276 F.3d at 841 n.5)

Defendants argue that because Payne reasonably and in good faith relied on his accountant's advice that logging companies are exempt from the overtime provisions of the FLSA, the district court erred in concluding that it had no discretion to decline to award or to reduce the liquidated damages. Defendants further argue that Timberline's pay structure resulting in higher-than-average compensation for its employees makes an award of liquidated damages particularly unjust.

Defendants have not presented sufficient evidence to meet their substantial burden to prove both good faith and reasonable grounds for the incorrect classification. As to the drivers, shop workers, and office workers, Payne himself testified that he knew these employees were not agricultural workers. Although Payne attempted to justify exempting his drivers and shop workers under the MCA exemption, Payne never sought advice for this decision or took any other active steps to inform himself regarding this determination. Further, he acknowledged that

his drivers never crossed state lines, and he was not able to explain any reasonable grounds he may have had for determining that the MCA exemption applied to purely intrastate drivers. Thus, Defendants have not met their substantial burden to prove both good faith and reasonable grounds for the incorrect classification of Timberline's drivers, shop workers, and office workers.

Defendants' employees performing harvesting and logging duties present a closer question. Taking Payne's testimony as true, he talked to Rooyakker on several occasions about whether the agricultural exemption applied. Although caselaw usually cites discussions with attorneys or government officials as evidence of good faith, *see, e.g.*, *Elwell*, 276 F.3d at 841 ("Nor has University suggested that it was relying on the expertise or opinion of any other person or entity with knowledge of the FLSA regulations, including its attorney or the Department of Labor."); *Featsent v. City of Youngstown*, 70 F.3d 900, 906-07 (6th Cir. 1995); *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 246-47 (5th Cir. 2016), some cases have extended this rationale to accountants, *see Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 316-17 (S.D.N.Y. 2011). However, several undisputed facts weigh against finding that Defendants could meet their burden here. First, Payne knew that Rooyakker's advice was flawed or incomplete, at least with respect to truck drivers and office workers. Second, Payne never discussed any of his employees' duties with Rooyakker such that Payne could reasonably believe that Rooyakker was advising that specific employees were exempt. And third, Rooyakker did not hold himself out as an expert in FLSA matters, and indeed never provided anyone else with advice on such matters.

Further, Defendants do not attempt to explain on appeal how a determination that any of their employees fell under the agricultural exemption was reasonable. The district court summarily rejected that the agricultural exemption applied; Defendants do not raise this issue on appeal; and Defendants' briefing regarding liquidated damages focuses primarily on the MCA exemption. Under these circumstances, Payne's general discussions with Rooyakker are insufficient as a matter of law for Defendants to meet their heavy burden to prove both good faith and reasonable grounds for the incorrect classification. *See Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984) (finding that advice of an accountant that compensation scheme was legal

eight to ten years prior to trial was insufficient to meet employer's burden where the employer "never sought an opinion from an attorney or the relevant government agency regarding the legality of" the compensation scheme and did not read government literature regarding wage and hour laws).

Finally, as the district court explained, Defendants' argument that they compensated their employees above the industry average is irrelevant to whether they met their burden to establish good faith and reasonable grounds for the determination that Timberline's employees were exempt from overtime coverage. If they had established both of those prongs, the district court could consider the overall compensation in the exercise of its discretion in awarding liquidated damages. But having failed to meet their burden, this argument is misplaced.

Accordingly, the district court correctly held that it had no discretion to award liquidated damages in an amount less than the amount of unpaid overtime compensation. *See* 29 U.S.C. § 216(b). However, because the amount of unpaid overtime compensation owed may change after further proceedings, we vacate the amount awarded for liquidated damages and remand for recalculation after further proceedings.

**III.**

For the reasons stated, we affirm the grant of summary judgment as to liability, including on the issue of liquidated damages, vacate the award of damages, and remand for further proceedings consistent with this opinion.